## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RIVERBANK, INC. <br><br> Plaintiff, <br><br> v. <br><br> RIVER BANK, <br><br> Defendant. | CIVIL ACTION NO. 1:07-cv-12354 |

## DEFENDANT RIVER BANK'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The Defendant River Bank (the "Defendant" or the "Bank") submits this memorandum in support of its Motion for Summary Judgment together with a Statement of Undisputed Material Facts, pursuant to Local Rule 56.1 ("Def.'s Facts").  For the reasons discussed below, the Defendant's motion should be granted.

## I.      INTRODUCTION

Based on a handful of misdirected telephone calls and letters, Plaintiff Riverbank, Inc., a solo tax preparation firm located in Brockton, Massachusetts, is claiming infringement of its trademark by the Defendant, a Massachusetts chartered savings bank, operating exclusively on Boston's North Shore and in Southern New Hampshire.  The Plaintiff concedes that: (1) it does not offer any services overlapping with those of the Defendant; (2) the parties are not competitors; and (3) it has not lost a single customer to Defendant.  Nevertheless, the Plaintiff alleges a likelihood of confusion between its mark "Riverbank, Inc." and the Bank's use of the mark "River Bank."  The Plaintiff does so even while acknowledging that the two marks consist of "entirely different word[s]

in the English language,"[1] and that it may be responsible for any alleged confusion based on incorrect Internet listings identifying the Plaintiff as "River Bank."  As will be made clear in these papers, the Plaintiff cannot establish that there is a likelihood of confusion between "River Bank" used in connection with licensed banking services and "Riverbank, Inc." used in connection with the preparation of tax returns.  The Defendant, therefore, is entitled to summary judgment in this case.

## II.      SUMMARY OF MATERIAL FACTS THAT ARE NOT IN DISPUTE

### A.      Defendant River Bank's Mark and Services

Defendant River Bank is a Massachusetts chartered savings bank with 7 branch locations located on the North Shore of Boston and in southern New Hampshire.  Def.'s Facts at ¶ 1.  For over one hundred years, River Bank was known as Lawrence Savings Bank.  Def.'s Facts at ¶ 10. In early 2006, the Bank employed a new management team, headed by President and CEO Gerald Mulligan.  Def.'s Facts at ¶¶ 11-12.  The team was tasked with reinvigorating the Bank, which had become stagnant with regard to profitability and had experienced a decline in its reputation in the community.  Def.'s Facts at ¶¶ 11-12.

The team decided to re-brand the Bank as a means of increases its visibility in its franchise area and communicating the changes introduced under the new management.  Def.'s Facts at ¶ 12. The Bank considered a number of names, including Tower Bank, Essex Bank, Vista Bank and River Bank.  Def.'s Facts at ¶ 13.  During the selection process, the Bank asked its counsel, James A. Brett, to conduct searches to determine the availability of the four names mentioned above. Def.'s Facts at ¶ 13.   Mr. Brett's searches did not reveal any trademark rights owned by the Plaintiff Riverbank, Inc.  Def.'s Facts at ¶ 19-20.   While the Plaintiff later applied for a registration

---

[1]      See Plaintiff's Opposition to Defendant's Motion to Amend at 6, Dkt. No. 15

for the mark "Riverbank, Inc.", this application was not filed until March of 2007, well after the search was conducted and the Bank had already changed its name. Def.'s Facts at ¶ 20. The Plaintiff has since abandoned its trademark application. Def.'s Facts at ¶ 56.

The Bank ultimately decided to change its name to "River Bank." Def.'s Facts at ¶16. The name was selected in part because it reflected the Bank's heritage as a member of the Merrimack River Valley community and because the name was relatable and accessible to the Bank's customers. Def.'s Facts at ¶ 17. In April of 2006, in preparation for the name change, Plaintiff's counsel James A. Brett contacted Plaintiff by letter to suggest that Plaintiff change its official corporate name (but not the name under which Plaintiff did business) to "Riverbank Financial, Inc." Def.'s Facts at ¶ 57. Mr. Brett did so because he believed, at the time, that River Bank might experience difficulty registering its corporate name in Massachusetts in light of Plaintiff's incorporation as Riverbank, Inc. Def.'s Facts at ¶ 57. Mr. Cosgrove did not substantively respond to Mr. Brett's letter prior to the Bank's name change. Def.'s Facts at ¶ 61. In fact, the Secretary of State's Office had no issues with the Bank's name change, which was approved by both the Division of Banks and the Secretary of State on May 26, 2006. Def.'s Facts at ¶ 62. The Bank's name change to "River Bank" was legally effective on June 23, 2006. Def.'s Facts at ¶ 63.

### B.      Plaintiff Riverbank, Inc.'s Alleged Mark and Services

After the Defendant had selected the name River Bank, it became aware of Plaintiff Riverbank, Inc. Def.'s Facts at ¶ 18. Plaintiff Riverbank, Inc. is a Massachusetts corporation located in Brockton, Massachusetts. Def.'s Facts at ¶ 22. The Plaintiff uses the mark "Riverbank, Inc.", including a stylized version of the mark on its business cards, stationary and signage. Def.'s Facts at ¶¶ 23-24. It offers tax preparation services, accounting services, and tax planning services for individuals, partnerships, companies and corporations. Def.'s Facts at ¶ 27. The Plaintiff does not offer any banking services and is not a competitor of the Defendant. Def.'s Facts at ¶ 31. Its

annual reports filed with the Massachusetts Secretary of the Commonwealth describe Plaintiff's business as "tax planning and preparation;" its abandoned trademark application included only "Tax and taxation planning, advice information and consultancy services; Tax preparation" services. Def's Facts at ¶¶ 29-30.

The Plaintiff's clients are mostly individuals but also include corporations, small businesses and nonprofit organizations, mostly located in the Brockton Massachusetts area.  Def.'s Facts at ¶¶ 32-33.  The Plaintiff targets its advertising efforts to small businesses and individual but receives most of its clients by word of mouth.  Def.'s Facts at ¶¶ 34-35; 37.  Its advertising focuses almost exclusively on promoting its tax planning and preparation services.  Def.'s Facts at ¶ 37.  The Plaintiff places print advertisements in local telephone books and publications by local organizations.  Def.'s Facts at ¶ 39.  Often these advertisements consist of a copy of Mr. Cosgrove's business card.  Def.'s Facts at ¶ 39.  The Plaintiff also purports to send print mailings to past, current, and prospective customers.  Def.'s Facts at ¶ 40.  Mr. Cosgrove testified that nearly every new client it receives is a result of a referral, not advertising efforts.   Def.'s Facts at ¶ 35.

The Plaintiff has a very limited presence on the Internet.  Def.'s Facts at ¶¶ 42-53.  It does not have an active website that it owns and operates, despite owning two domain names.  Def.'s Facts at ¶ 43.  Its email address, rather than incorporating its mark or its domain names, is "484taxprep@live.com."  Def.'s Facts at ¶44.  Instead, the Plaintiff advertises its services on two-third party web adverting sites.  Def.'s Facts at ¶¶ 45-48.  On at least one of these sites, which groups services by geographical location, Plaintiff's principal Daniel Cosgrove is featured more prominently as an individual than as a part of Riverbank, Inc.  Def.'s Facts at ¶ 47.

The Plaintiff is also included in various third-party website directories.  Def.'s Facts at ¶ 49. The Plaintiff does not monitor or police these listings and, in fact, many of the sites list the Plaintiff using the Defendant's name "River Bank" – not the Plaintiff's name "Riverbank, Inc." and then

include Plaintiff's correct contact information.  Def.'s Facts at ¶ 51-53.  As a result of the Plaintiff's

own laxity, an Internet user could search for the Defendant "River Bank" and receive a listing that

displays Plaintiff's telephone number.  Def.'s Facts at ¶ 51-54.

> **C.      Defendant's Name Changes and Plaintiff's Allegations of Confusion**

The Plaintiff alleges that following the Bank's name change, it began receiving misdirected

communications for the Bank which it was forced to expend considerable time and money to

redirect or otherwise handle.  Def.'s Facts at ¶67.  In fact, the Plaintiff produced only 18 purportedly

"documented" instances of alleged confusion over the 30-month period from June 2006, when

Defendant changed its name until late 2008 after the lawsuit had been filed.  Def.'s Facts at ¶¶ 68;

72.  The Plaintiff has classified these instances as "misdirected communications" based on its belief

that the referenced phone call or letter was intended for the Defendant but instead reached the

Plaintiff's tax preparation office.  Def.'s Facts at ¶ 69.  These instances consist mostly of telephone

phone calls fielded by Mr. Cosgrove or his wife.  Def.'s Facts at ¶ 72, Chart 1.  The Plaintiff's

testimony suggests that most of these wrong number calls were no more than ten to twenty minutes.

Def.'s Facts at ¶¶ 73-74.  Specifically, Mr. Cosgrove testified that, with regard to some calls: "I

would have kept it as short as possible," "[s]ometimes it was, you know, very short," "[a]gain, it

happens fast," "it would have been something quick."  Def.'s Facts at ¶ 75.  He went on to testify

that "sometimes you wind up in a conversation, some people you probably wind up talking to them

about the weather."  Def.'s Facts at ¶ 76.

Rather than forward any communications directly to Defendant River Bank, Mr. Cosgrove

simply told the callers that they were looking for the Bank, or he forwarded the small number of

mail and faxes to his attorney.  Def.'s Facts at ¶ 78.  To the latter point, he indicated that the

messages were only taken to keep track of the number of telephone calls and not for the purpose of

forwarding any information to the Bank.  Def.'s Facts at ¶ 79.  The Plaintiff has testified that the

only expenses incurred in handling the misdirected communications are time, money spent on

telephone bills and ink and paper for faxes, stating "[t]ime is money to me,"and "[m]oney certainly

would have been spent on phone calls.  Money certainly would have been spent on forwarding

faxes." Def.'s Facts at ¶ 83.  The Plaintiff has not been able to quantify with any degree of certainty

the amount of time spent on each individual call or even estimate the amount of aggregate time

Plaintiff has allegedly expended handling any "misdirected communications."  Def's Facts at ¶¶ 73-

77.  Nor has the Plaintiff sufficiently established or even provided an estimate of the amount of

money allegedly expended on telephone bills or office supplies.[2]  Def.'s Facts at ¶¶ 83-84.

## III.    DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show there is no issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Pignons S.A. de

Macanique v. Polaroid Corp., 657 F.2d 482, 486 (1st Cir. 1981); Fed. R. Civ. P. 56.  Upon a

defendant's motion for summary judgment, the court must determine "whether a fair minded jury

could return a verdict for the plaintiff on the evidence presented" or whether the evidence "is so

one-sided that [defendant] must prevail as a matter of law." Anderson v. Liberty Lobby, Inc, 477

U.S. 242, 252 (1986); Pump, Inc. v. Collins Management, Inc., 746 F. Supp. 1159, 1162 (D.Mass.

1990).  Importantly, summary judgment is appropriate if a party fails to sufficiently establish the

---

[2]      The Plaintiff's singular inability to quantify its presumed damages provides an additional and independent
reason for granting judgment in Defendant's favor.  As this Court is well aware, damages that are "remote, speculative,
hypothetical and not within the realm of reasonable certainty" are not recoverable.  See Sonoran Scanners, Inc. v.
Perkinelmer, Inc., 590 F. Supp. 2d 196, 211 (D. Mass. 2008) (internal citations omitted).  In order to establish its
damages with any degree of certainty, the Plaintiff would have to establish at a minimum (1) the number of calls
received and (2) the amount of time and/or money expended on each call.  Plaintiff cannot even measure a guess at
either.  Def.'s Facts at ¶¶ 73-77; 83-84.  As such, its claim for damages must fail as a matter of law.  Sonoran, 590 F.
Supp. 2d at 211 (granting summary judgment in favor of defendant when plaintiffs failed to present evidence sufficient
to establish their damages with the necessary certainty).

existence of an essential element of that party's case for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Pump, 746 F. Supp. at 1162.  The cornerstone of any trademark infringement claim is likelihood of confusion between the marks at issue and a plaintiff must establish this essential element in order to survive a defendant's motion for summary judgment.  Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir. 1983); Pignons, 657 F.2d at 486.  As discussed below, the evidence, including Plaintiff's own admissions, clearly establishes that Defendant must prevail as a matter of law and, therefore, this Court should enter summary judgment in Defendant's favor.

> **B.**     **Plaintiff Cannot Establish a Likelihood of Confusion**

In order to prove its claim of trademark infringement, Plaintiff must establish the essential element of likelihood of confusion between the marks at issue.  Astra, 718 F.2d at 1205.  The following factors are relevant to determining whether a likelihood of confusion exists: (1) similarity of the marks; (2) similarity of the goods or services; (3) relationship between the parties' channels of trade; (4) relationship between the parties' advertising; (5) classes of prospective purchasers; (6) evidence of actual confusion; (7) defendant's intent in adopting the mark; and (8) strength of the mark.  Id.  A perusal of the undisputed facts in this case reveals that the Plaintiff will not be able to show that any of these factors weigh sufficiently in its favor and, therefore, this Court should enter judgment for the Defendant.  See Astra, 718 F.2d at 1205; Pignons, 657 F.2d at 486; Pump, 746 F. Supp. at 1173.

> **1.**     **The Defendant's Mark "River Bank" is Not Confusingly Similar to the Plaintiff's "Riverbank, Inc." Mark.**

In comparing the marks, similarly must be determined based on the total effect of the designation in the context in which the marks are presented to consumers, including any stylized elements of the marks.  Boston Athletic Ass'n. v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989); Pignons,

657 F.2d at 487; Pump, 746 F. Supp. at 1167.  The subject marks should be "considered in light of what occurs in the marketplace" including the "circumstances surrounding the purchase of the goods or services."  Calamari Fisheries, Inc. v. Village Catch, Inc., 698 F. Supp. 994, 1009 (D. Mass. 1988).  Similarity based solely on the use of the same word is tenuous and will not necessarily lead to a likelihood of confusion.  Pump, 746 F. Supp. at 1167-8 (noting that, despite being phonetically identical, the two marks (both "Pump") were used in different contexts and with different visual displays.)  The determination of whether marks are confusingly similar therefore depends on each mark's "total effect."  Pignons, 657 F.2d at 487.

In this case, the differences in the marks, both visually and in the impressions they create, limit the likelihood of confusion.  The Defendant uses the mark "River Bank" most often in a stylized logo which appears below.  Def.'s Facts at ¶ 64.



In the stylized version of the mark, the word "RIVER" appears in blue, with an extended arm of the letter "R" and the word "BANK" appears in green.  Def.'s Facts at ¶ 65.  In marketing and publicity materials in which the word appears in text, the mark appears as two words without a space, i.e., RiverBank.  Def.'s Facts at ¶ 66.

The Plaintiff's mark is "Riverbank, Inc." Def.'s Facts at ¶¶ 23-24.  Consumers are most likely to encounter the stylized version of the Plaintiff's mark, which appears on its business cards, stationary and advertising and on Plaintiff's signs.  Def.'s Facts at ¶ 24.  The Plaintiff's stylized mark appears below:

Riverbank, Inc.

Differences in the marks are apparent.  The Defendant distinguishes between the words "River" and "Bank" by using different colors in its stylized logo.  Def.'s Facts at ¶¶ 64-65.  When the mark appears in text, the letter "B" in Bank is capitalized.  Def.'s Facts at ¶ 66.  This creates the consistent impression of a mark consisting of two words and identifying the Defendant as a duly licensed bank.  The Defendant also uses its stylized mark most often in connection with the fanciful design of a tower in blue and green.  Def.'s Facts at ¶ 64.

The Plaintiff on the other hand, uses the word "Riverbank" in connection with "Inc.," indicating it is a corporation as distinguished from a bank.  In fact, the Plaintiff does not and <u>could not use the mark as the Defendant does</u> (i.e., as two words) because the Plaintiff would then run afoul of Mass. Gen. Laws ch. 167A, which prohibits entities not authorized to conduct business as a bank from using the word "bank" in their name.  <u>See</u> M.G.L.A. ch. 167A § 37.  As Plaintiff concedes, its mark suggests a "riverbank" or the bank of a river.  <u>See</u> Plaintiff's Opposition to Defendant's Motion to Amend at 5, Dkt. No. 15.  In contrast, Defendant's mark "River Bank" or "RiverBank" suggests that the mark is used with a banking institution.  As Plaintiff represented to the Court in its Opposition to Defendant's Motion to Amend:

> Riverbank has not transacted any business under a name or title which includes the words "bank' "banking" or "bankers.  It has only used the wor[d] "Riverbank," which is <u>an entirely different word in the English language</u>.

Plaintiff's Opp. at 6 (emphasis added).  Plaintiff's own distinctions between the terms Riverbank, Inc. and River Bank or RiverBank underscore the lack of similarity of between the marks.

The Plaintiff will also fail should it attempt to rely solely on the marks' phonetic similarity because mere use of the same word or same combinations of words is not sufficient to show likelihood of confusion.  <u>See</u> <u>Pump</u>, 746 F. Supp. at 1167-8.  Furthermore, consumers are more likely to encounter the marks in print than read aloud.  The Plaintiff engages only in print and very limited Internet advertising.  Def.'s Facts at ¶¶ 38-47.  The Bank, on the other hand, advertises in

print, on the Internet, on television and in limited radio spots on Spanish speaking stations. Def.'s Facts at ¶¶ 5-6; 9.

Moreover, the Plaintiff's mark is most often displayed in connection with other details regarding Plaintiff's tax services, i.e., Mr. Cosgrove's name and qualifications and the phrase "a tax planning and preparation firm." Def.'s Facts at ¶¶ 25; 36; 39-40. The Defendant most often pairs its mark with a fanciful design of a tower. Def.'s Facts at ¶ 64. Consistently pairing a mark with other unique identifiers serves to limit the likelihood that confusion will occur. <u>Pignons</u>, 657 F.2d at 487 (granting summary judgment when defendant always used the word "Alpha" in connection with other identifying language in contrast with plaintiff's use of "Alpa"); <u>Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc.</u>, 1993 WL 343679, Civ. Action No. 93-11161-WF, *10 (D. Mass. Aug. 18, 1993) (granting summary judgment for defendant when marks used by radio stations were always used with station's slogan, brand name, and dial position). When viewed in the context in which the marks are presented to consumers, the total effect of each mark is sufficiently distinct to prevent any likelihood of confusion. Therefore, this factor weighs strongly in favor of the Defendant.

> **2.      The Defendant's Highly Regulated Banking Services are Unlikely to Be Confused with the Plaintiff's Tax and Bookkeeping Services**

The Defendant is a bank, authorized under the laws of Massachusetts to conduct business as a bank. Def.'s Facts at ¶ 1. Specifically, the Defendant's services include offering residential and commercial real estate loans, construction, consumer and commercial loans and checking, money market, certificate of deposit and individual retirement accounts. Def.'s Facts at ¶ 2. The Plaintiff,

by its own admissions, offers <u>none</u> of these services.  Def.'s Facts at ¶ 31.[3]  Instead, it offers mostly

tax planning and preparation services, which accounts for the "bulk" of Plaintiff's business.  Def.'s

Facts at ¶¶ 27-30.  While the Plaintiff also offers some "oddball" financial services – such as

business projections or bookkeeping (Def.'s Facts at ¶ 28) – it cannot fabricate a similarity in

services by relying on a broad "financial services" category.  Indeed, this type of broad

generalization is "not helpful in assessing the likelihood of confusion."  <u>Alta Vista Corp., Ltd. v.</u>

<u>Digital Equip. Corp</u>, 44 F. Supp. 2d 72, 77 (D. Mass. 1998) (noting that increasing the level of

generality can lead to the unwarranted conclusion that any products or services are "related").

Instead, the intended use, function and cost of the goods or services will determine their similarity.

<u>Pignons</u>, 657 F.2d at 487-88.

        In this case, the services offered by the parties are vastly different.  The Defendant, as a

bank, maintains deposit relationships with its individual customers.  Def.'s Facts at ¶¶ 2; 8.  These

relationships are ongoing and tend to remain consistent over time and throughout the year.

Defendant also offers commercial, residential, real estate and consumer loans (Def.'s Facts at ¶ 2)

which are likely to involve a significant amount of money and occur only after what can be a

lengthy decision-making process.  <u>See</u> <u>Astra</u>, 718 F.2d at 1206 ("there is always less likelihood

---

[3]  Q:    Do you offer banking services?
     A:    I do not.
     Q:    Do you offer real estate loans?
     A:    I do not.
     Q:    Do you offer construction loans?
     A:    I do not.
     Q:    Do you offer consumer loans?
     A:    I do not.
     Q:    Do you offer commercial loans?
     A:    I do not.
     Q:    Do you offer checking account services?
     A:    I do not.
     Q:    Do you offer money market account
services?
     A:    I do not.

Q:    Do you offer certificate of deposit account
services?
A:    I do not.
Q:    Do you offer individual retirement account
services?
A:    I do not.
Q:    Do you offer savings account services?
A:    I do not.
Q:    Do you offer any banking services?
A:    I do not.
Q:    Do you compete with the defendant in this
case for the services?
A:    For the services, no.

Def.'s Facts at ¶ 31.

confusion where goods are expensive and purchased after careful consideration"). The Plaintiff, on the other hand, mainly offers its clients a standardized, repeat once-a-year service – tax preparation. The Plaintiff charges an average of $60-$175 for preparing an individual tax return. Def.'s Facts at ¶ 27.

The Plaintiff's business is results-driven and provides relatively "ordinary" services (i.e., preparing and filing taxes before April 15 each year) whereas Defendant's services are more sophisticated and relationship-driven (i.e., maintaining and managing deposit accounts and loan transactions). As a result, the services are substantively distinguishable and not likely to be confused. See Northern Trust Corp. v. Northern Bank & Trust Co., 1991 WL 346397, Civ. Action No. 89-3052-T, *2 (D.Mass. Nov. 26, 1991) (finding no likelihood of confusion between financial and banking services offered by the plaintiff bank-holding company and a local bank defendant based on the differing levels of sophistication between the services offered). Simply because both parties' services fall broadly into the financial industry does not lead to a likelihood of confusion. See Astra, 718 F.2d at 1206 (granting summary judgment because a broad inference that both products are used in the same general field "is not sufficient to demonstrate that a genuine issue exists concerning likelihood of confusion"); Alta Vista, 44 F. Supp. 2d at 77 (literary services and Internet search engine services are not confusingly similar even though both are involved in the publishing and television markets).

Furthermore, banking is a highly regulated industry and the Plaintiff does not and could not offer banking services. Indeed, Plaintiff is prohibited by law from even using a name that might indicate to consumers that it offers banking services without proper authorization. See M.G.L.A. ch. 167A § 37. Tax preparation and bookkeeping services, however, are essentially the opposite – the Plaintiff offers services that individuals can and do perform themselves, either manually or with tax preparation software. As a consequence, consumers are less likely to confuse the Defendant's

highly regulated banking services with the Plaintiff's tax and accounting services.  <u>See</u> <u>Bay State</u>

<u>Savings Bank v. Baystate Financial Services, LLC</u>, 484 F. Supp. 2d 205, 217 (D. Mass.

2007)(finding that "no reasonable consumer would have expected plaintiff to be selling [regulated]

products and services" offered by defendant because plaintiff was legally prohibited from doing so).

Overall, the vast differences between the services offered by the Plaintiff and Defendant

make confusion unlikely and weigh in favor of granting summary judgment for Defendant.  <u>See</u>

<u>Astra</u>, 718 F.2d at 1206; <u>Pignons</u>, 657 F.2d at 487.

> **3.** **The Parties Occupy Different Channels of Trade, Engage in Vastly Different Advertising Techniques and Target Different Classes of Prospective Purchasers**

The similarity between the parties' channels of trade, advertising and classes of prospective

purchasers are often considered together in the First Circuit for the purposes of a likelihood of

confusion analysis.  <u>Astra</u>, 718 F.2d at 1206.   Each of these factors weighs against the Plaintiff in

this case.  The Defendant's advertising is fairly fulsome within its trade area on the North Shore of

Massachusetts and Southern New Hampshire.  Def.'s Facts at ¶¶ 5-6; 9.  The Defendant advertises

its goods and services in promotional and marketing materials, on television and the radio, in paid

print advertisements, by press releases in local newspapers and via its website at www.riverbk.com.

Def.'s Facts at ¶¶ 5-6; 9.

The Plaintiff, on the other hand, testified that "word of mouth and referrals is probably the

biggest place where all – I'd say all – the largest portion of my business comes from."  Def.'s Facts

at ¶ 34-35.  Its advertising in print is very limited and consists mostly of placing Mr. Cosgrove's

business card in local publications such as a local police association book.  Def.'s Facts at ¶¶ 38-40.

Unlike the Defendant, the Plaintiff does not concentrate significant resources on advertising and, in

fact, sees little return on what minimal efforts it makes. Indeed, Plaintiff testified that "every new client I've gotten, with very few exceptions, are from referrals." Def.'s Facts at ¶ 35.

The parties' service offerings also differ in geographic scope. Plaintiff is located in Brockton and only engages in limited advertising on the Internet and in local paid print advertisements. Def.'s Facts at ¶¶ 38-40. In fact, Plaintiff's Internet presence through its subscription with the FreeServiceFinder website illustrates the geographic areas primarily targeted by Plaintiff - the user must click on "South Shore" and then "Plymouth County" in order to locate Plaintiff's advertisement (were a user looking for Defendant the "Boston & North Shore" link would be the most likely choice – the Plaintiff itself often refers to Defendant as the "Bank on the north shore"). Def.'s Facts at ¶ 46.

While the Plaintiff's business is centered in the Brockton area, the Defendant's customers are located primarily within a 20 mile radius of its North Shore office. Def.'s Facts at ¶ 7. Indeed, to protect against fraud, Defendant does not offer deposit services to individuals who cannot show a local connection with one of its branch offices (i.e., proximity to place of residence or occupation or a prior existing relationship with the bank). Def.'s Facts at ¶ 8. The Defendant does not have any customers in Brockton. Def.'s Facts at ¶ 4.

Likewise, the parties target different classes of prospective customers. The Plaintiff sends most of his mailings to past or current customers and then relies on word for mouth and referrals to obtain new clients. Def.'s Facts at ¶¶ 34-35; 40. In contrast, the Bank casts an indiscriminating net with its print, radio and television ads in the North Shore and Southern New Hampshire area to attract individuals and small businesses. Def.'s Facts at ¶¶ 5-9.

Given the different geographic scope the parties occupy, the differing nature and extent of advertising each employs, and the fact that the Plaintiff obtains nearly all of his business by

referrals, these three factors conclusively favor the Defendant and summary judgment is warranted. See <u>Astra</u>, 718 F.2d at 1207; <u>Pignons</u>, 657 F.2d at 489.

> **4.     The Plaintiff's Alleged Instances of Actual Confusion Amount to Temporary *De Minimis* Confusion at Best**

In this case, the Plaintiff simply has not and cannot allege any actual confusion that indicates consumers are mistaken as to the source of services provided by the Plaintiff and the Defendant. Not all "confusion" between two entities is of the sort protected by the Lanham Act.   <u>See International Assoc. of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 204, 201 (1st Cir. 1996)("<u>IAM</u>"); <u>Pump</u>, 746 F. Supp. at 1169;  <u>CCBN.com, Inc. v. C-call.com, Inc.</u>, 73 F. Supp. 2d 106; <u>Infinity</u>, 1993 WL 343679 at *11.  Simple cases of misidentification or carelessness that fail to result in confusion as to the source or origin of services simply cannot support a claim of trademark infringement.  <u>IAM</u>, 103 F.3d at 201; <u>Pump</u>, 746 F. Supp. at 1169;  <u>CCBN</u> 73 F. Supp. 2d at 106; <u>Infinity</u>, 1993 WL 343679 at *11.

The Plaintiff's evidence of actual confusion consists of 18 "documented" instances of alleged confusion.  Def.'s Facts at ¶¶ 68; 72.  The majority of instances are recorded as no more than a phone number and a date or time.  Def.'s Facts at ¶ 72, Chart 1.   In each instance referenced by Plaintiff, the senders of the communication were seeking the Defendant's banking services, not the Plaintiff's services.  The senders were not confused about the <u>source</u> of any services but were simply confused as to how to reach Defendant.[4]  Def.'s Facts at ¶¶ 70; 72.  Indeed, this is the very criteria used by the Plaintiff to determine which telephone calls it received fell within the category of "misdirected communications."  Def.'s Facts at ¶ 69 ("I identified that they were looking for

---

[4]       Such "confusion" may reasonably be seen as resulting from Plaintiff's own failure to correctly identify itself as "Riverbank, Inc." on the Internet or otherwise police the third-party websites.  Def.'s Facts at ¶¶ 50-54.   A number of Internet listings identify Plaintiff as "River Bank" but list Plaintiff's correct contact information.  Def.'s Facts at ¶¶ 51-54.

River Bank, and I said you've – you haven't reached what you're looking for").  In light of these facts, the Plaintiff cannot establish that any consumer mistakenly thought the Defendant was offering the tax preparation services actually offered by the Plaintiff or vice versa.  See Pump, 746 F. Supp. at 1169 (none of the evidence presented by plaintiff showed that the persons allegedly confused mistakenly thought that the defendant's product was actually released by plaintiff).

Furthermore, the Plaintiff unequivocally testified that no consumers of Riverbank, Inc.'s tax or financials services were lost or diverted to the Defendant based on confusion between the marks.[5] Def.'s Facts at ¶ 82.  Importantly, alleged instances of "confusion" are inconsequential in a trademark infringement analysis if the consumer is not actually deceived into purchasing the alleged infringers product or service when the consumer was in fact seeking out the plaintiff's goods or services.  CCBN, 73 F. Supp. 2d at 113 ("[i]t is simply unrealistic to conclude that any initial confusion over service marks would translate into actual confusion in purchasing the parties' products" internal quotations omitted); Pump, 746 F. Supp. at 1170 ("[t]here is simply no evidence that anyone ever bought [defendant's product] thinking that it came from [plaintiff]").  The type of confusion alleged in this case is easily remedied well before the point at which a consumer would decide to use either the Defendant's or the Plaintiff's services.

In fact, based on inferences drawn from the scribbled messages the Plaintiff recorded, most of the caller/senders were likely already customers of the Defendant (see Def. Facts at ¶ 72, Chart 1, No. 1 (caller "looking to reach mortgage broker Jack Piloi") or seeking information regarding

---

[5]
| | | |
|---|---|---|
| Q: | Do you know of any clients that you have that you lost to the defendant? | |
| A: | I'm not aware of that. | |
| Q: | Do you know of any sales of your services that you've lost to defendant? | |
| A: | I'm not aware of any. | |
| Q: | Do you know of any client that the defendant took from you? | |
| A: | I'm not aware of any. | |

Def.'s Facts at ¶ 81.

services Defendant had already provided to an existing customer (<u>see</u> Def. Facts at ¶ 72, Chart 1, No. 9 (seeking verification of assets for account holder), No. 11 (looking to do a wire transfer for account holder), No. 12 (seeking verification of deposit); No. 14 (information regarding account holder's accounts)).  Furthermore, some communications were merely requests for information, not potential customers who were seeking services but were confused as to the source.  <u>See e.g.</u>, Def. Facts at ¶ 72, Chart 1, No. 3 and 4 (communications from HireRight seeking to verify employment of individuals by River Bank).

Additionally, and unlike the instances here, any actionable confusion must be such that it "carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." <u>IAM</u>, 103 F.3d at 201.  Confusion resulting from "carelessness, indifference or ennui will not suffice." <u>Id.</u>  Therefore, temporary *de minimis* confusion, such as a smattering of misdirected telephone calls, is of "minimal legal significance" in determining whether there is a likelihood of confusion within the scope of the Lanham Act.  <u>Infinity</u>, 1993 WL 343679 at *11; <u>Hasbro, Inc. v. Clue Computing, Inc.</u>, 66 F. Supp. 2d 117, 124 (D. Mass. 1999); <u>CCBN</u>, 73 F. Supp. 2d 106, 113 ("de minimis confusion, which is easily resolved, and does not affect the ultimate purchase decision, is of minimal relevance").

The only evidence offered by the Plaintiff – 18 instances over a 2 ½ year period – is clearly *de minimis*.  <u>CCBN</u>, 73 F. Supp. 2d at 113 (finding confusion to be *de minimis* when plaintiff offered affidavits describing up to twenty incidents of alleged confusion in two months).  Moreover, the "confusion" could be explained by simple carelessness on the part of the callers.  It might also be explained by Plaintiff's own carelessness in failing to ensure that it is listed properly on the Internet.  Def.'s Facts at ¶¶ 50-54.  While the Plaintiff may feel frustrated and inconvenienced at having to answer the occasional misdirected phone call, this type of evidence is insufficient to

support an action for trademark infringement under the Lanham Act.[6]  Hasbro, 66 F. Supp. 2d at

125 (finding that while alleged instances of misdirection on Internet may "rise to level of

inconvenience, it is not sufficient to raise a dispute as to actual confusion").

### 5.     Defendant's Intent in Adopting the Mark

Likewise, the Plaintiff is unable to establish any bad faith on the Bank's part in adopting the

mark.  There is no evidence that would suggest the Defendant intended to appropriate the Plaintiff's

name and concurrent goodwill or benefit from the Plaintiff's reputation.  Astra, 718 F.2d at 1208.

Importantly, the Defendant selected the River Bank name before it was even aware of the Plaintiff's

existence.  Def.'s Facts at ¶ 18.  Moreover, the Defendant chose the name River Bank to reflect the

heritage of its surrounding community in the Merrimack River Valley and because it viewed the

name as conveying a relatable concept (one of a river) to its customers.  Def's Facts at ¶ 17.  While

the Defendant's counsel contacted the Plaintiff prior to the Defendant's name change, this is not

evidence that the Defendant or its counsel was concerned with likelihood of confusion.  Instead,

Defendant sought to preemptively take care of any potential hold ups in registering the name with

the Secretary of State's office by suggesting that the Plaintiff change its official name.  Def.'s Facts

at ¶¶ 57-58.  When the Secretary of State approved the Defendant's name change, the Bank no

longer considered there to be any issue.  Def.'s Facts at ¶¶ 59; 62-63.  Indeed, the suggestion that

Plaintiff continue doing business under the Riverbank, Inc. name and change only its official

corporate name (Def.'s Facts at ¶ 60) belies any interpretation of Mr. Brett's letter that suggests

Defendant was worried about conflicts between the two marks in the marketplace.

---

[6]       In fact, the Plaintiff testified that it occasionally receives misdirected calls intended for other entities such as
the post office or an electric company.  Def.'s Facts at ¶ 81.  Plaintiff also received a package intended for "Two Rivers
Holding Group," a New York corporation, which it forwarded by Fed Ex to the intended recipient.  Def.'s Facts at ¶ 81.
Such minor inconveniences are incidental to operating a business or using commercial or residential telephone lines.
Were the Plaintiff not "tracking" the calls and communications for the purpose of building an action against the
Defendant, any disruption to Plaintiff's business would be minimal.

In any event, the Defendant's counsel undertook a trademark search and the Plaintiff's mark did not surface, because the Plaintiff only applied to register the mark "Riverbank, Inc." after being contacted by the Bank's attorney and after the Bank had already changed its name. Def.'s Facts at ¶¶ 19-20. The Plaintiff's trademark application has since been abandoned. Def.'s Facts at ¶ 21. Accordingly, this factor also favors Defendant.

### 6.      Strength of the mark

The Plaintiff will also be unable to establish that the mark Riverbank, Inc. is particularly strong. The following factors are relevant in determining the strength of a particular mark: (1) the length of time it has been used and the plaintiff's renown in the field; (2) the strength of the mark in the field; and (3) the plaintiff's actions in promoting the mark. Boston Athletic, 867 F.2d at 32. In this case, Plaintiff has used the mark "Riverbank, Inc." for approximately eight years. Def.'s Facts at ¶ 23. The Plaintiff has offered no evidence of renown in the field and Plaintiff's limited presence on the Internet suggests it is not well known in its field.

Additionally, the Plaintiff consistently promotes its services in connection with Mr. Cosgrove's qualifications (Def.'s Facts at ¶ 25; 47) and it reasonably follows that any conceivable renown of the Plaintiff's services, if any, is likely tied just as strongly to his name as to the name Riverbank, Inc. Furthermore, the Plaintiff has not engaged in significant efforts to promote the mark or develop a connection between the Plaintiff's services and the mark "Riverbank, Inc." in the mind of consumers. Def.'s Facts at ¶¶ 34-56. In addition, a number of entities in Massachusetts and the surrounding areas also use the mark Riverbank or a combination of the words "River" and "Bank." Def. Fact's at ¶¶ 14; 55. This concurrent use by various entities dilutes the strength of the mark and makes confusion less likely. See Northern, 1991 WL 346497 at *5. In light of these facts, the Plaintiff's mark is relatively weak, and this factor weighs in favor of granting summary judgment for Defendant.

**IV.     CONCLUSION**

In light of the material undisputed facts of record, the Plaintiff will be unable to establish

that <u>any</u> of the factors indicating a likelihood of confusion weigh in its favor.  Indeed, the evidence

before this Court is "so one-sided that [Defendant] must prevail as a matter of law."  <u>Anderson v.</u>

<u>Liberty Lobby, Inc</u>, 477 U.S. at 252.  Because the Plaintiff has failed to establish an essential

element of its trademark infringement claim, this Court should enter summary judgment in favor of

the Defendant.

River Bank,

By its attorneys,

 /s/ Thomas F. Holt, Jr.
Thomas F. Holt, Jr. (BBO# 238830)
  thomas.holt@klgates.com
Tara C. Clancy (BBO# 567020)
  tara.clancy@klgates.com
Phi Lan M. Tinsley (BBO# 656815)
  philan.tinsley@klgates.com
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Dated: February 27, 2009
Boston, Massachusetts 02111-2950
(617) 261-3100

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing document filed through the ECF system will be
sent electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF).

 /s/ Thomas F. Holt, Jr.
Thomas F. Holt, Jr.